BARCON ASSOCIATES, INC., PLAINTIFF-APPELLANT, v.
TRI–COUNTY ASPHALT CORPORATION,
DEFENDANT-RESPONDENT.

Argued November 18, 1980—Decided May 28, 1981.

180

*J. William Barba* argued the cause for appellant (*Shanley & Fisher,* attorneys; *Mr. Barba* and *Charles A. Reid, III,* on the briefs).

*Irwin I. Kimmelman* argued the cause for respondent (*Kimmelman, Wolff & Samson,* attorneys; *Mr. Kimmelman* and *Ronald E. Wiss,* on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

In this case we are called upon to decide whether the existence of an undisclosed, substantial business relationship between a party-designated arbitrator in tri-partite arbitration and the party designating that arbitrator constitutes "evident partiality" under *N.J.S.A.* 2A:24–8(b) and is therefore grounds for vacating the arbitration award.

Both the trial court and the Appellate Division held that it did constitute partiality. We granted Barcon's petition for certification, 84 *N.J.* 422 (1980). Because we share the Appellate

Division's concern "for the rightness in this way of doing business, open, aboveboard and candid," 172 *N.J.Super.* 186, 189, and for the need to prohibit "any appearance of bias sufficient to discredit this useful adjudicatory tool sanctioned in the law and controlled by its statutes," *id.* at 190, we now affirm its judgment to vacate the arbitration award.

In addition, we establish prospectively the requirement that every arbitrator, whether party-designated or "neutral," disclose to the parties, prior to the commencement of arbitration proceedings, any relationship or transaction that he has had with the parties or their representatives. This disclosure should also include any other fact which would suggest to a reasonable person that the arbitrator is interested in the outcome of the arbitration or which might reasonably support an inference of partiality.

## I

In 1974 plaintiff, Barcon Associates, Inc. (Barcon), a general contractor, entered into a construction subcontract with defendant Tri-County Asphalt Corporation (Tri-County). Disagreements arose under the subcontract which led Barcon to institute a suit against Tri-County in September 1975.

In December 1975, on Tri-County's motion, the trial court stayed the suit pending arbitration pursuant to terms of the parties' subcontract. That subcontract provided that any disagreement

> shall, upon written notice of either to the other party, be submitted to three arbitrators for decision. Each party shall choose one arbitrator..., the third to be chosen ... by the two thus selected.

Tri-County designated as its arbitrator Gareld R. Gray, an officer of an international contracting firm.[1] Barcon chose

---

[1]Gray testified that his firm had used Tri-County as a subcontractor during 1971–1974 but had not done business with Tri-County for three or four years when arbitration commenced in 1977.

Vincent Spatz, a New Jersey general contractor, as its arbitrator. Gray and Spatz agreed upon Allen Arnowitz, a New Jersey consulting engineer, as the neutral arbitrator and chairman of the panel.

Arbitration hearings were held in January and March 1977. Several months later the arbitration panel informed the parties that by a two-to-one vote the panel had decided in favor of Barcon, and that Tri-County should pay Barcon $29,500 "in settlement of all claims" between the parties.

In December 1977, Barcon sought confirmation of the award in the Superior Court pursuant to *N.J.S.A.* 2A:24–7.[2] Tri-County counterclaimed that the award should be vacated on grounds of the "evident partiality and misconduct" of Spatz, the arbitrator designated by Barcon.

The basis of Tri-County's counterclaim was the business dealings that Spatz had with Barcon in 1977 throughout the pendency of the arbitration proceedings. Tri-County contended that Spatz "transgressed into the realm of 'evident partiality' when he failed to disclose" these dealings. In fact, Spatz had done business with Barcon for approximately twenty years by the time of his designation as Barcon's arbitrator in this case. Two transactions between Spatz's construction company and Barcon were ongoing during the arbitration proceedings in 1977.

One involved paving work completed by Spatz's firm in August 1976.[3] Spatz's firm billed Barcon $25,215.84 for this work

---

These past dealings between Tri-County and the employer of its designated arbitrator are not at issue in this case.

[2] *N.J.S.A.* 2A:24–7 provides in relevant part:

A party to the arbitration may, within 3 months after the award is delivered to him, unless the parties shall extend the time in writing, commence a summary action in the court ... for the confirmation of the award or for its vacation, modification or correction. Such confirmation shall be granted unless the award is vacated, modified or corrected.

[3] This work was done at Chester Springs Shopping Center, also the site of the disputed work which Tri-County had sub-contracted to do for Barcon.

on August 31, but by the time arbitration hearings began in January 1977 Barcon had made no payments on this account and owed Spatz $26,763.15, the original balance due plus interest, against this bill. In February 1977 Barcon paid $3,000 and on March 1 Spatz sent to the president of Barcon a bill showing a balance due of $24,527.05, on which Spatz wrote "Joe—Since August!!! Please. Vin." Barcon made further payments of $3,000 in March and $10,000 in April, but at the time the arbitration panel rendered its award on December 9, 1977, Barcon still owed Spatz over $13,000 on this account.

The second ongoing transaction involved paving work done by the Spatz firm for Quail Ridge Corporation, a wholly-owned subsidiary of Barcon. This was part of a long-term project that commenced before the arbitration and continued after. Payments received on this account included one of $43,005.78 made in July 1977 while the arbitration panel was still deliberating.

In April 1978 the trial court, in a decision from the bench, vacated the arbitration award because of Arbitrator Spatz's "evident partiality within the meaning of *N.J.S.A.* 2A:24-8(b)." [4] However, in response to Barcon's subsequent motion to settle the form of judgment, *R.* 4:42-1, the court held further evidentiary hearings to determine whether Tri-County had knowledge, before or during the arbitration proceedings, of Spatz's dealings with Barcon and thereby waived its right to object after the proceedings had ended. Following these hearings, Judge Stanton rendered a thorough written opinion supporting his decision to vacate the award. The trial court said that although "reasonable men would expect a party-designated arbitrator to have a general cast of mind broadly favorable to the position of the designating party," such a "broadly favorable predisposition of mind ... cannot be permitted to become bias or to degenerate

---

4*N.J.S.A.* 2A:24-8(b) provides:
    The court shall vacate the award in any of the following cases: ....
    b. Where there was either evident partiality or corruption in the arbitrators, or any thereof ....

into partisanship, nor can objective appearances of bias or partisanship be permitted." 160 *N.J.Super.* 559, 570.

On appeal, the Appellate Division affirmed, expressing its strong disapproval of "any appearance of bias sufficient to discredit this useful adjudicatory tool." 172 *N.J.Super.* at 190. In addition, the court adopted a requirement, based on *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 *U.S.* 145, 149, 89 *S.Ct.* 337, 339, 21 *L.Ed.* 301, 305 (1968), that "arbitrators disclose to the parties any dealings that might create an impression of possible bias."

## II

Commercial arbitration is a long-established practice in New Jersey consistently encouraged by the Legislature. Even under seventeenth century colonial rule, arbitration was fostered by statute, Boskey, *A History of Commercial Arbitration in New Jersey* (pt. 1), 8 *Rut.—Cam.L.J.* 1, 5 (1976), reflecting a public policy unchanged to the present day and embodied in the current arbitration act, *N.J.S.A.* 2A:24–1 to –11, *Hudik-Ross, Inc. v. 1530 Palisade Ave. Corp.*, 131 *N.J.Super.* 159, 166 (App.Div.1974).

The courts of this State have also favored arbitration. *E. g.*, *Kearny PBA Local # 21 v. Town of Kearny*, 81 *N.J.* 208, 221 (1979); *Daly v. Komline-Sanderson Engineering Corp.*, 40 *N.J.* 175, 177 (1963); *Ukrainian National Urban Renewal Corp. v. Muscarelle, Inc.*, 151 *N.J.Super.* 386, 396–97 (App.Div.1977), certif. denied, 75 *N.J.* 529 (1977); *Public Utility Construction and Gas Appliance Workers, Local 274 v. Public Service Elec. & Gas Co.*, 35 *N.J.Super.* 414, 419 (App.Div.1955), certif. denied, 19 *N.J.* 333 (1955); *Eastern Engineering Co. v. City of Ocean City*, 11 *N.J.Misc.* 508, 510 (Sup.Ct.1933); *Fennimore v. Childs*, 6 *N.J.L.* 386, 388 (Sup.Ct.1797). Because it has retained this status in the law and because it offers significant advantages to the parties, arbitration is a widely-used means of resolving commercial disputes. *See Boskey, supra* (pt. 2), 8 *Rut.-Cam.L.J.* 284, 309–10 (1977).

Arbitration is "a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law," and its object is "the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties." *Eastern Engineering, supra,* 11 *N.J.Misc.* at 510–11, quoted in *Carpenter v. Bloomer,* 54 *N.J.Super.* 157, 162 (App.Div.1959). Arbitration can attain its goal of providing final, speedy and inexpensive settlement of disputes only if judicial interference with the process is minimized; it is, after all, "meant to be a substitute for and not a springboard for litigation." *Korshalla v. Liberty Mutual Ins. Co.,* 154 *N.J.Super.* 235, 240 (Law Div. 1977). Consequently, "every intendment is indulged in favor of the award and it is subject to impeachment only in a clear case." *Carpenter v. Bloomer, supra,* 54 *N.J.Super.* at 168; *accord, Kearny PBA Local # 21, supra,* 81 *N.J.* at 221 ("An arbitrator's award is not to be cast aside lightly."); *Eastern Engineering, supra,* 11 *N.J.Misc.* at 511; *International Brotherhood of Teamsters, Local 560 v. Bergen-Hudson Roofing Supply Co.,* 159 *N.J.Super.* 313, 315 (Ch.Div.1978); *Leslie v. Leslie,* 50 *N.J.Eq.* 103, 108 (Ch.1892), aff'd, 52 *N.J.Eq.* 332 (E & A 1894).

These principles are incorporated in the arbitration act, *N.J. S.A.* 2A:24–1 to –11. The act grants arbitrators extremely broad powers and extends judicial support to the arbitration process subject only to limited review. A court may compel an uncooperative party to arbitrate, *N.J.S.A.* 2A:24–3, and may stay litigation pending arbitration, *N.J.S.A.* 2A:24–4. Arbitrators are empowered to subpoena witnesses and evidence, and such subpoenas will be enforced by the courts, *N.J.S.A.* 2A:24–6. "[A]rbitrators decide both the facts and the law," *Daly v. Komline-Sanderson, supra,* 40 *N.J.* at 178, and the determinations of arbitrators are given collateral estoppel effect by reviewing courts, *Ukrainian National Urban Renewal Corp. v. Muscarelle, supra,* 151 *N.J.Super.* at 398. Courts are available to confirm arbitration awards, *N.J.S.A.* 2A:24–7. Arbitrators are given these extensive powers subject to judicial review limited

to the narrow grounds of arbitrator partiality or corruption, fraud, undue means, conduct prejudicial to the rights of a party or failure to make a "mutual, final and definite award," *N.J.S.A.* 2A:24–8, or "evident" mistakes by the arbitrators, *N.J.S.A.* 2A:24–9.

A necessary corollary of the fact that arbitrators function with the support, encouragement and enforcement power of the state is the requirement that they adhere to high standards of honesty, fairness and impartiality. "An arbitrator acts in a *quasi* -judicial capacity and must render a faithful, honest and disinterested opinion upon the testimony submitted to him." *Brotherton, Inc. v. Kreielsheimer,* 8 *N.J.* 66, 70 (1951); *see also Carpenter v. Bloomer, supra,* 54 *N.J.Super.* at 162; *Eastern Engineering, supra,* 11 *N.J.Misc.* at 511; *Leslie v. Leslie, supra,* 50 *N.J.Eq.* at 107; *Kearny PBA Local # 21, supra,* 81 *N.J.* at 226 (Pashman, J., concurring); *Commonwealth Coatings Corp. v. Continental Casualty Co., supra,* 393 *U.S.* at 148–49, 89 *S.Ct.* at 339, 21 *L.Ed.2d* at 304–05; *American Eagle Fire Ins. Co. v. New Jersey Ins. Co.,* 240 *N.Y.* 398, 405, 148 *N.E.* 562, 564 (1925); *J. P. Stevens & Co. v. Rytex Corp.,* 34 *N.Y.2d* 123, 129, 312 *N.E.2d* 466, 469, 356 *N.Y.S.2d* 278, 282 (1974).

We emphasize that these standards must govern the conduct of *all* arbitrators in whose hands the dispute resolution process is entrusted—not only so-called "neutral" arbitrators but party-designated arbitrators as well.

In *American Eagle Fire Ins. Co. v. New Jersey Ins. Co., supra,* Judge Pound of the New York Court of Appeals made several accurate observations about party-designated arbitrators.

> [T]he practice of arbitrators of conducting themselves as champions of their nominators is to be condemned as contrary to the purpose of arbitrations, and as calculated to bring the system of enforced arbitrations into disrepute.... [A party-designated arbitrator] is not an advocate whose function is to convince the umpire or third arbitrator.... He must lay aside all bias, and approach the cause with a mind open to conviction and without regard to his previously formed opinions as to the merits of the party or the cause. He should sedulously refrain from any conduct which might justify even the inference that either party is the special recipient of his solicitude or favor. [240 *N.Y.* at 405, 148 *N.E.* at 564]

Our Legislature shares this view. The statute governing the vacation of awards for arbitrator partiality or corruption draws no distinction between neutral and party-designated arbitrators. *N.J.S.A.* 2A:24–8(b) provides that a court shall vacate arbitration awards,

> [w]here there was either evident partiality or corruption in the arbitrators, *or any thereof* .... [emphasis added]

█ Although arbitration originates in the contract of the parties and is a process which may operate without any court involvement, we reject the notion, repeatedly asserted by the dissent, that the parties' contract should prevail over all other considerations. In particular, we give priority to the need to maintain the integrity of arbitration and public faith in the process. The dissent objects that our holding today disregards "the paramount public policy consideration" of encouraging "voluntary arbitration as a means of resolving commercial disputes informally, expeditiously, relatively inexpensively, and in a manner that relieves our overburdened judicial resources," *post* at 210. However, it is our strongly held view that honest, fair and impartial arbitration is as important as the finality of arbitration. *See Moshier v. Shear*, 102 *Ill.* 169, 174 (1881) (commenting, in regard to commercial arbitration, that "however desirable it may be to terminate protracted contention, it is more desirable that justice shall be administered, free from all improper or corrupting influences."). *Cf. Graham v. Scissor-Tail, Inc.*, 28 *Cal.*3d 807, 623 *P.*2d 165, 171 *Cal.Rptr.* 604, 613, 615 (1981) (disapproving "complete contractual autonomy in the choice of an arbitrator," which must give way to "the common law requirement of fair procedure"). Because of the confidentiality in which arbitrators conduct their deliberations, the goal of ensuring that they will adhere to high standards will best be attained by requiring them to avoid not only actual partiality but also the appearance of partiality.[5] *Commonwealth Coatings*

---

[5]We realize that this rule may conflict with the old case of *Central Union Stock Yards Co. v. Uvalde Asphalt Paving Co.*, 82 *N.J.Eq.* 246 (Ch.1913),

*Corp. v. Continental Casualty Co., supra,* 393 *U.S.* at 150, 89 *S.Ct.* at 340, 21 *L.Ed.*2d at 305 ("[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but must also avoid even the appearance of bias."); *Northwest Mechanical, Inc. v. Public Utilities Comm'n of City of Virginia, Minn.,* 283 *N.W.*2d 522, 524 (1979); *Moshier v. Shear, supra,* 102 *Ill.* at 174–75; *see J.P. Stevens & Co. v. Rytex Corp., supra,* 34 *N.Y.*2d at 126–27, 312 *N.E.*2d at 467–68, 356 *N.Y.S.*2d at 280.

Although standards pertaining to the requisite impartiality of party-designated arbitrators are not susceptible to precise formulation in the abstract, some general observations can be made. As a starting point, we register our agreement with the following principle which appears in the *Code of Ethics for Arbitrators in Commercial Disputes* jointly drafted by the American Arbitration Association and the American Bar Association. Party-designated arbitrators, according to the *Code,*

> may be predisposed toward the party who appointed them but in all other respects are obligated to act in good faith and with integrity and fairness. [Holtzmann, *The First Code of Ethics for Arbitrators in Commercial Disputes,* 33 *The Business Lawyer* 309, 319 (1977)]

While a party-designated arbitrator may approach the arbitration proceedings with some sympathy for the position of the party designating him, such an arbitrator must remain faithful to the obligation which rests upon him to maintain "broad public confidence in the integrity and fairness of the [arbitration] process." *Id.* at 312. Thus, *all* arbitrators should "conduct the proceedings in an evenhanded manner and treat all parties with equality and fairness at all stages of the proceedings." *Id.* at 316. Most important, arbitrators "should decide all matters justly, exercising independent judgment, and should not permit outside pressure to affect the decision." *Id.* at 317. All arbitrators, party-designated and neutral, must exercise their responsi-

---

which appears to require vacation of an award only when *actual* partiality of an arbitrator is shown. To the extent that what we say today conflicts with *Uvalde,* that case is overruled.

bilities in a manner worthy of the great trust and power placed in them by the Legislature and courts of this State.

■ Whether a particular party-designated arbitrator has run afoul of these precepts and shown evident partiality can be decided only on the facts of each case. To illustrate, if it were shown that there existed a possible conflict of financial interest on the part of the arbitrator; or that the arbitrator prejudged the dispute because of bias or partisanship; or that there was animus on the part of the arbitrator against the other side, such a showing would demonstrate evident partiality. The party alleging that an arbitrator was impermissibly biased has the burden of proving that allegation by a preponderance of the evidence introduced concerning these or any other relevant factors.

### III

■ Applying the above principles to the facts of this case, the judgment of the Appellate Division vacating the arbitration award must be affirmed. No actual bias or partiality on the part of Arbitrator Spatz has been alleged. Nevertheless, throughout the pendency of the arbitration proceedings, Spatz was engaged in business dealings with and was owed substantial sums by the party which designated him. This relationship creates too great an *appearance* of partiality to be permitted. An arbitrator cannot, if challenged by the other side, be allowed to participate in the resolution of a dispute when such a manifest conflict of interest exists. As the trial court concluded,

the line between the acceptable general predisposition of attitude permitted in the case of a party-designated arbitrator and impermissible bias or partisanship (or the appearance thereof) is crossed when the arbitrator is involved in active and significant business dealings with a party during the pendency of the arbitration proceedings. The idea of biased or partisan arbitration is conceptually inadmissible, and the law simply cannot allow any judicially enforceable arbitration proceeding to be anything other than an impartial proceeding which has appropriate appearances of impartiality. [160 *N.J.Super.* at 570–71, 390 *A.2d* 684]

## IV

We recognize that considerable waste results when an award is vacated after the proceedings have run their full course with the consequent investment of time and money by the parties. It is necessary to reduce the risk that such waste will occur and to remain faithful to the goals of minimizing judicial involvement and leaving the arbitration process in the hands of the parties, as well as to effectuate the intent of the Legislature that all arbitrators be impartial. Accordingly, we adopt the requirement that every arbitrator, neutral or party-designated, make full disclosure of possible conflicts of interest to the parties, prior to commencement of arbitration proceedings.[6] This disclosure should reveal any relationship or transaction that he has had with the parties or their representatives as well as any other fact which would suggest to a reasonable person that the arbitrator is interested in the outcome of the arbitration or which might reasonably support an inference of partiality. *See Richco Structures v. Parkside Village, Inc.*, 82 *Wis.*2d 547, 557, 263 *N.W.*2d 204, 211 (1978) (applying a similar disclosure requirement to neutral arbitrators); *accord, Commonwealth Coatings Corp. v. Continental Casualty Co., supra*, 393 *U.S.* at 149, 89 *S.Ct.* at 339, 21 *L.Ed.*2d at 305 (Arbitrators must disclose "any dealings that might create an impression of possible bias."); *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.*, 495 *F.*2d 1260, 1264 (2d Cir. 1973) ("[A]rbitrators should disclose fully all their relationships with the parties, whether these ties be of a direct or indirect nature."); *J. P. Stevens & Co., Inc. v. Rytex Corp., supra*, 34 *N.Y.*2d at 129–30, 312 *N.E.*2d at 469, 356 *N.Y.S.*2d at 283 ("[A]ll arbitrators before entering upon their duties should make known any relationship direct or indirect that they have with any party to the arbitration, and disclose all facts known to

---

[6]A letter submitted to each of the parties should be sufficient for this purpose. We note that this is the procedure for disclosure followed by the American Arbitration Association. G. Goldberg, *A Lawyer's Guide to Commercial Arbitration* 40 (1977).

them which might indicate any interest or create a presumption of bias."); *Northwest Mechanical, Inc. v. Public Utilities Comm'n of City of Virginia, supra* (applying disclosure requirement to both a party-designated arbitrator and a neutral arbitrator); *Johnston v. Security Ins. Co. of Hartford,* 6 *Cal.App.*3d 839, 843, 86 *Cal.Rptr.* 133, 136 (1970) (applying disclosure requirement to neutral arbitrator); American Arbitration Association, *Commercial Arbitration Rules* § 19 (1980 ed.) (neutral arbitrators must disclose "any circumstances likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their counsel."); M. Domke, *Commercial Arbitration* 72 (1965); G. Goldberg, *A Lawyer's Guide to Commercial Arbitration* 39–40 (1977).[7]

Such a pre-arbitration disclosure requirement has several advantages. It will, as suggested above, reduce the likelihood of potentially wasteful post-arbitration challenges, which may well be brought by "a suspicious or disgruntled party ... as a pretext for invalidating the award," *Commonwealth Coatings, supra,* 393 *U.S.* at 151, 89 *S.Ct.* at 340, 21 *L.Ed.*2d at 306 (White,

---

[7]The dissent objects that our opinion is "mistakenly based on decisional law 'concerning the·alleged bias or partiality of *neutral,* not party-appointed arbitrators.'" *Post* at 204.

Not only is this objection inaccurate, but even if true, it would in no way detract from our analysis. The issue here is not, as the dissent suggests, "standards of impartiality," but rather the best way to assure adherence to those standards. These authorities are cited as support for our decision to apply a disclosure requirement to arbitrators and, appropriately enough, each authority supports imposition of such a requirement. That some involve the application of this requirement to neutral arbitrators is irrelevant; the point is that many other courts believe, as do we, that the best way to ensure that appropriate standards of impartiality will be maintained in arbitration proceedings, while minimizing disruption of the arbitration process, is to require arbitrators to make full disclosure to the parties at the outset.

Thus, the dissent's lengthy disquisition on why our citation of the AAA *Commercial Arbitration Rules* § 19 is "inapposite" and "of no relevance," *post* at 204, is simply incorrect.

J., concurring). Furthermore, this procedure will enhance the integrity of arbitration with little hardship to the parties. The mere fact that a party-designated arbitrator discloses a prior relationship with the party will not necessarily disqualify him. Many such relationships would not constitute "evident partiality" under *N.J.S.A.* 2A:24–8(b).

Disclosure will leave to the parties themselves the initial decision as to whether to object to an arbitrator designated by the other side and, if necessary, to seek judicial determination of whether that arbitrator appears to be too partial to be permitted to participate in the arbitration. This procedure is thus consistent with the goal of minimizing judicial interference in the arbitration process, and recognizes that the parties, as active participants in their respective industries, are well situated to decide when to object because contacts between an arbitrator and the party designating him create too great a likelihood of bias.

We recognize that arbitrators are often chosen precisely because they are experienced in the industry in which the dispute has arisen. When an industry is small, the possibility that potential arbitrators have had *some* prior contact with one or both of the parties is considerable. *See* G. Goldberg, *A Lawyer's Guide to Commercial Arbitration, supra,* at 39. We fully agree with Justice White's observations that

> [a]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best and most capable potential arbitrators.
>
> .    .    .    .    .    .    .    .
>
> The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.
>
> .    .    .    .    .    .    .    .
>
> If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial

to warrant vacating an award. [*Commonwealth Coatings, supra,* 393 *U.S.* at 151–52, 89 *S.Ct.* at 340–341, 21 *L.Ed.*2d at 305–06 (White, J., concurring)]

As the Wisconsin Supreme Court said in *Richco Structures, supra,*

> A rule of full disclosure strikes the proper balance between ensuring finality of arbitration awards and ensuring justice and fairness (and the appearance of justice and fairness) in arbitration proceedings. It permits the fully informed parties to balance the need for impartial arbitrators and the need for experienced, knowledgeable arbitrators when they select the arbitration panel. [82 *Wis.*2d at 560, 263 *N.W.*2d at 212]

■ At the same time, we emphasize that the arbitrators must make *full* disclosure prior to the commencement of proceedings and also inform the parties of any pertinent facts that arise once proceedings have begun. A party can make a sound judgment as to an arbitrator's possible partiality only if the arbitrator discloses all relevant information. When a relevant fact is not disclosed at the outset of the proceedings and the award is later challenged, the reviewing court may vacate the award if it concludes that the undisclosed fact would have been such as to lead a reasonable person to object to the designation of the arbitrator in question. There need not be evidence that the arbitrator was actually biased. *See Richco Structures, supra,* 82 *Wis.*2d at 562, 263 *N.W.*2d at 213.

■ However, should an arbitrator make full disclosure and the other party fail to object at that time, that party will be held to have waived any right later to object to the designation of the arbitrator on the grounds so revealed. This is in accordance with settled law. *International Brotherhood of Teamsters, Local 560 v. Bergen-Hudson Roofing Supply Co., supra,* 159 *N.J.Super.* at 316; *Hartwyk v. Monroe Calculating Machine Co.,* 13 *N.J.Super.* 160, 164–65 (Ch.Div. 1951); *Milliken Woolens, Inc. v. Weber Knit Sportswear, Inc.,* 11 *App.Div.*2d 166, 168, 202 *N.Y.S.*2d 431, 434 (1960).

Parties should, if they approach the matter in good faith, have no problem agreeing on arbitration panels prior to the commencement of proceedings. Furthermore, as a result of the full disclosure rule which we adopt today, post-award challenges in

the courts will be very infrequent. It is clearly in the interests of all concerned for the two parties to review the disclosures made by arbitrators under the rule in a spirit of fairness and reasonableness.

V

With all due deference to the dissent's knowledge of the field of commercial arbitration, we think it appropriate to emphasize that it is the judicial enforceability of an arbitration award that is at issue here, not just the state of commercial practice in the field of arbitration. The parties may agree to any form of dispute resolution that they wish, but they may not seek the backing of the courts for private actions that, while substituting for the judicial function, are fraught with the appearance of bias. Notwithstanding commercial practice, however prevalent, the Court must examine independently the propriety of allowing *arbitrators*, although designated by the parties, to act as *advocates* in the arbitration proceedings, since by law the results of these proceedings are enforceable by the courts.

As regards the present state of the practice of commercial arbitration, the dissent apparently assumes that all parties to commercial arbitration agreements are equally sophisticated and experienced. But not all parties to commercial arbitration agreements enjoy the advantage of a battery of legal advisors at every step of the process. Consequently, we should not hesitate to resist a commercial practice that, if as prevalent as the dissent contends, taints the very process which allows the parties to resolve disputes without recourse to the courts. We wonder as well why the dissent believes that all parties to tri-partite arbitration agreements actually intend to allow an advocate for the opposing side to have the ear of the one neutral arbitrator throughout the panel's private deliberations.

The dissent's criticisms of our position indicate an unwillingness to read this opinion as written. Nowhere do we suggest that an arbitrator "would have been qualified to sit on the panel

even though his prior business dealings had rendered him totally dependent on the party selecting him, and his future business life similarly dependent, just so long as there were no present, ongoing business dealings between them." *Post* at 208. The dissent incorrectly ascribes such a view to us and then conveniently calls it "untenable." [8]

The dissent also places undue emphasis on the rule of waiver we have adopted for these arbitration proceedings. The rule that a party waives a ground for challenging an adverse disposition when it fails to note a timely objection is simply a procedural rule of litigation necessary to avoid unfairness to the other party and waste of adjudicatory resources. *Cf. R.*, 1:7–2, 1:7–5, and 2:10–2 (time for objections and notice of errors on appellate review). Courts can only rule on the apparent partiality of an arbitrator if one of the parties objects and brings the matter before the courts. It would be inequitable and wasteful to allow a party to withhold its objections until after the panel has rendered an unfavorable decision. While we do not condone arbitration awards made by a panel whose members are not impartial, we see a greater evil in permitting parties that are aware of grounds for objection to put the other party and the panel through the time and expense of arbitration proceedings before challenging the proceedings.

Contrary to the dissent's assertion, what we find "most objectionable" is not "arbitrator Spatz's failure to disclose his substantial business relationship with Barcon at the outset of the arbitration proceedings." *Post* at 203. What we find most objectionable is the existence of these relationships where the opposing party has raised a timely objection. Since there was no disclosure in this case, Tri-County's objection after the ad-

---

[8]Nor, as to a minor point, do we understand the reasoning behind the dissent's statement that a creditor is the last person who might be biased in favor of the party that selected him. *Post* at 208. Creditors do not necessarily want to see their debtors lose a financial dispute and be indebted to competing creditors.

verse award was timely. In the future, the disclosure requirement will allow the same kind of objection to be brought prior to the arbitration proceedings. However, it will still be the responsibility of the parties, as in other forms of litigation, to bring the matter before the courts by making a timely objection.

The dissent also assumes that including a waiver of the disclosure requirement in the arbitration agreement will have the same effect as failing to object after disclosure. This opinion does not address that question, nor do we see the dissent's assumption as necessarily following from our procedural waiver rule.

Nevertheless, this assumption leads the dissent to state, "The worst possible bias in fact is to be permitted, if waived, and the forbidden appearances are equally permitted." *Post* at 209. A careful reading of our opinion belies this statement. Since "bias in fact" could normally be demonstrated only by reference to actions of the arbitrator after proceedings have begun, failure to object at the time of disclosure could not constitute waiver of objection to actual bias which becomes known only later. If the dissent's point, however, is that the parties could knowingly allow a biased arbitrator to sit on the panel, our response is that the same could happen if after the arbitration award a party fails to object although it is aware of actual bias in the panel. We repeat that a court can act only when the parties ask it to act and when they comply with its procedural rules.

The dissent notes that an arbitrator's "interest in the proceedings" which existed at the outset of arbitration "would not dissipate upon the disclosure of the relationship," and therefore wonders how disclosure maintains the integrity of arbitration. *Post* at 208. The purpose of disclosure, of course, is to provide parties to arbitration with the information necessary to object to the designation of a particular arbitrator. The disclosure ameliorates to some extent any appearances of bias for it places the relationships of the parties and the arbitrators out in the open and allows the parties to determine knowledgeably what degree

of contact between a party and its designated arbitrator will not, in their view, prejudice the proceedings.

The existing relationships in this case were not placed out in the open. Since arbitrator Spatz was owed such a substantial sum by one of the parties and received payments throughout the pendency of the arbitration, it is difficult to understand how the dissent can claim that the "appearance of bias" created by these substantial business dealings was "at best ... speculation without substance," *post* at 203, quoting *International Produce, Inc. v. A/S Rosshavet*, 638 *F.*2d 548, 551 (2d Cir. 1981).[9]

Finally, we note the inability of the dissent to state affirmatively why the practice of designating a biased arbitrator does not amount to "evident partiality ... in the arbitrators, or any thereof." *N.J.S.A.* 2A:24–8(b). It is worth repeating that the statute does not make a distinction between neutral and party-designated arbitrators. Yet the dissent would hold the "evident partiality" language of the statute inapplicable to party-designated arbitrators.

If the dissent's views were the law, each party could designate its own president as its chosen arbitrator. But not even the parties in this case would suggest that such was their intent. After all, neither nominated one of its own officers or employees. Perhaps they recognized, unlike our dissenting brethren, that arbitration should be conducted by arbitrators, not by the parties themselves or their legal advocates.

## VI

In accordance with the foregoing, we affirm the judgment of the Appellate Division vacating the arbitration award.

---

[9]It may also be noted that the facts of *Rosshavet*, cited and relied upon by the dissent in its opinion, are easily distinguishable from, and far less egregious than, the facts of this case. In *Rosshavet*, the contacts in question were between an arbitrator and the law firms representing the parties, and had been fully disclosed to the parties. *Id.* at 549–50.

CLIFFORD, J., dissenting.

Presented with the opportunity to fuse the applicable law with the real world of long-standing, successful commercial practice, the Court has chosen instead to "throw a monkey wrench into the gears" of tripartite commercial arbitration. See *Kearny PBA Local # 21 v. Town of Kearny,* 81 *N.J.* 208, 227 (1979) (Pashman, J., concurring). The majority's panegyric on impartiality overrules our settled case law going back at least three score years and eight, reformulates our arbitration statute and judicial interpretation thereof, takes liberties with decisional authority from other jurisdictions, brushes aside the contract of the parties, invites pre-arbitration disputes and post-arbitral award challenges, and jeopardizes the efficiency that has hitherto characterized the private resolution of commercial disputes. In sum, the Court "not only departs radically from existing caselaw dealing with the nature of judicial review of arbitrators' awards but more importantly, strips commercial arbitration of its basic value." *In re Arbitration Between Grover and Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 233 (Pashman, J., dissenting). Because the record before us does not warrant intrusion into a practice that is getting along nicely without our judicial intervention, I am constrained to dissent.

I

Barcon's contract with Tri-County anticipated the possibility of a disagreement under the contract. It addressed the issue of dispute resolution by providing for arbitration, with one arbitrator to be chosen by each party and those two to select the third. In the event of a party's failure to appoint an arbitrator, the contract created the machinery for appointment of "an arbitrator to *represent* the party in default" (emphasis added). Although neither party had to resort to this appointment device in the case before us, the contract language of an arbitrator acting as a party's "representative" was neither inadvertent nor without significance.

When the dispute in question went to arbitration, Tri-County selected as its arbitrator Gareld R. Gray, a civil engineer employed by S.J. Groves & Sons Co., general contractors, with whom Tri-County had done about $3,000,000 worth of business in the recent past. For its arbitrator Barcon chose Vincent A. Spatz, an independent general contractor who had done business with both parties. Gray and Spatz then agreed on the appointment of Allan Arnowitz, a consulting engineer, as the neutral arbitrator. Mr. Arnowitz, who had no relationship with either party, served as chairman of the panel. The business dealings between Barcon and its selected arbitrator, Spatz, provided the basis for the trial court's vacating of the arbitration award in Tri-County's favor. 160 *N.J.Super.* 559 (Law Div.1978). The Appellate Division affirmed. 172 *N.J.Super.* 186 (1980).

In approving this result the Court holds that a tri-partite commercial arbitration award may be vacated under *N.J.S.A.* 2A:24–8(b) for the "evident partiality" of a party-designated arbitrator who maintains "an undisclosed, substantial business relationship" with the party designating him. This result pertains even though no bias or partiality was actually manifested by the arbitrator. Rather, the majority decides that under *N.J.S.A.* 2A:24–8(b) the mere appearance of partisanship arising out of the business relationship between the arbitrator and the party selecting him is sufficient to vacate an otherwise untainted award.

## II

Until today the law in New Jersey has been that an arbitral award will not be vacated for the "evident partiality" of a party-designated arbitrator unless there is a showing of actual bias or partiality in the course of the arbitrator's conduct in the hearing, deliberation, decision or award. See *Central Union Stock Yards Co. v. Uvalde Asphalt Paving Co.*, 82 *N.J.Eq.* 246, 260–61 (Ch.1913). The burden of proof has been on the party seeking to upset the award to demonstrate actual partiality in

the course of the proceedings. *Uvalde, supra,* 82 *N.J.Eq.* at 258, 260–61; *Int'l Bhd. of Teamsters v. Bergen-Hudson Roofing Supply Co.,* 159 *N.J.Super.* 313, 315 (Ch.Div.1978); *Palizzoto v. Local 641, Int'l Bhd. of Teamsters,* 67 *N.J.Super.* 145, 154 (Ch.Div.1961), *aff'd o. b.,* 36 *N.J.* 294 (1962).

As stated by Judge Fuld for the New York Court of Appeals in *Astoria Medical Group v. Health Ins. Plan,* 11 *N.Y.2d* 128, 227 *N.Y.S.2d* 401, 182 *N.E.2d* 85 (Ct.App.1962), an attack on an arbitral award based on the "evident partiality" of a party-appointed arbitrator "must be based on something overt, some misconduct on the part of [the] arbitrator, and not simply on his interest in the subject matter of the controversy or his relationship to the party who selected him." 11 *N.Y.2d* at 137, 227 *N.Y.S.2d* at 407, 182 *N.E.2d* at 89. The reasoning of *Astoria* is in conformity with a proper reading of the statutory expression "evident" partiality. It also accords with the generally recognized view that in order to justify the setting aside of a commercial arbitration award, the arbitrator's bias or prejudice arising out of a special relationship with one of the parties "must be direct, definite and capable of demonstration, rather than remote, uncertain or speculative." M. Domke, *The Law and Practice of Commercial Arbitration* § 21.02 (1968). Previous business relationships, friendship, or even the status of being a creditor of one of the parties should not justify the setting aside of an arbitral award, provided there is no showing of fraud, misconduct, or actual bias or partiality evidenced during the course of the proceedings. See C. Updegraff & W. McCoy, *Arbitration of Labor Disputes* 71 (2d ed. 1961).

The Court relies on *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 *U.S.* 145, 89 *S.Ct.* 337, 21 *L.Ed.2d* 301 (1968), as support for the proposition that all arbitrators, whether neutral or party-designated, are required "to avoid not only *actual* partiality but also the appearance of partiality." *Ante* at 189. That case, however, does not lend support to the majority's equation of the "appearance" of partiality with "evident partiality" under the applicable provision of the arbitration

statute; for as the Second Circuit recently held, in a case involving a neutral arbitrator, "the Supreme Court in *Commonwealth Coatings* did not expand the [statutory] standard of 'evident partiality' to include 'appearance of bias.'" *International Produce, Inc. v. A/S Rosshavet*, 638 *F.*2d 548, 551 (2d Cir. 1981). In the instant case, as in *Rosshavet*, "we have an assertion of 'appearance of bias' which seems to us, at best to be speculation without substance." *Id.* at 551. The majority acknowledges, as well it must, that there was not a showing nor even an allegation of actual partiality, unfairness, bias or fraud on the part of arbitrator Spatz at any time during the proceedings under review. "Thus, the record is completely bare of anything remotely resembling 'evident partiality.'" *Id.* The majority's complete reformulation of the arbitration statute and judicial interpretation thereof is particularly unwarranted in a case where, as here, no claim is made of misconduct indicating actual bias or partiality in any degree.

### III

That which the Court finds most objectionable is arbitrator Spatz's failure to disclose his substantial business relationship with Barcon at the outset of the arbitration proceedings. Accordingly, it imposes upon all arbitrators, whether neutral or party-appointed, the requirement of full disclosure of any business relationships with the parties that might "suggest to a reasonable person that the arbitrator is interested in the outcome of the arbitration or which might reasonably support an inference of partiality." *Ante* at 192. Perhaps the weakness in the Court's chain of analysis is most graphically illustrated by the fact that every authority the majority cites for the imposition of this disclosure requirement is concerned with business relationships involving arbitrators intended by the parties to be neutral. See *Commonwealth Coatings, supra*, 393 *U.S.* at 146, 89 *S.Ct.* at 338, 21 *L.Ed.*2d at 303 ("the third arbitrator, the supposedly neutral member of the panel"); *Sanko S. S. Co., Ltd. v. Cook Industries, Inc.*, 495 *F.*2d 1260, 1261 (2d Cir. 1973)

(neutral arbitrator); *Johnston v. Security Ins. Co. of Hartford*, 6 *Cal.App.*3d 839, 843, 86 *Cal.Rptr.* 133, 136 (Ct.App.1970) ("the neutral umpire or arbitrator"); *Northwest Mechanical, Inc. v. Public Utilities Comm'n*, Minn., 283 *N.W.*2d 522, 524 (Minn.1979) (neutral arbitrator); *J. P. Stevens & Co., Inc. v. Rytex Corp.*, 34 *N.Y.*2d 123, 126, 312 *N.E.*2d 466, 467, 356 *N.Y.S.*2d 278, 280 (Ct.App.1974) (AAA-appointed arbitrator intended to be neutral); *Richco Structures v. Parkside Village, Inc.*, 82 *Wis.*2d 547, 550, 263 *N.W.*2d 204, 207 (Wis.1978) (neutral arbitrator). Moreover, in *Richco Structures, supra,* the majority's paramount authority for imposing the full disclosure requirement upon party-designated arbitrators, the Supreme Court of Wisconsin expressly limited its analysis to the neutral arbitrator. *Id.,* 263 *N.W.*2d at 210. It is abundantly clear that the majority's opinion is mistakenly based on decisional law "concerning the alleged bias or partiality of *neutral,* not party-appointed arbitrators." *Tipton v. Systron Donner Corp.,* 99 *Cal.App.*3d 501, 506–07, 160 *Cal.Rptr.* 303, 306 (Ct.App.1979) (citing *Johnston v. Security Ins. Co., supra*) (emphasis in original).

The disclosure requirement imposed by § 19 of the American Arbitration Association (AAA) *Commercial Arbitration Rules* (1980 ed.) is likewise inapposite. The agreement between the parties in the instant case does not provide that arbitration of contract disputes be conducted in accordance with the *Commercial Arbitration Rules* of the AAA. More importantly, even had the agreement contained such a provision, § 19 of the AAA rules would not have imposed upon arbitrator Spatz the duty to disclose his business relationships with Barcon. The requirements of § 19 are expressly limited to apply only to "person[s] appointed as neutral Arbitrator[s]." The AAA disclosure requirement of § 19 is therefore of no relevance to the situation at hand.

## IV

Today's decision results in an indiscriminate muddling of the heretofore dissimilar expectations of impartiality with respect to

party-designated and neutral arbitrators. It thereby runs the risk of distorting the idiosyncratic nature of the tripartite commercial arbitration procedure for which the parties bargained. As indicated heretofore the arbitration clause in the parties' sub-contract provided that in the event of any dispute arising thereunder, each party was to appoint one arbitrator of its choice, with the third to be chosen by the two thus selected. By agreeing upon this method of selection, both parties necessarily, and by design, accepted the fact that the two arbitrators initially selected represent the interest of the party that selected them. See *Richco Structures, supra,* 82 *Wis.*2d at 556, 263 *N.W.* 2d at 210; *Astoria, supra,* 11 *N.Y.*2d at 134–35, 227 *N.Y.S.*2d at 404–05, 182 *N.E.*2d at 87–88; *Karpinecz v. Marshall,* 48 *Misc.*2d 8, 264 *N.Y.S.*2d 65, 68 (Sup.Ct.1965); M. Domke, *supra,* at § 20.04; Note, *The Use of Tripartite Boards in Labor, Commercial and International Arbitration,* 68 *Harv.L.Rev.* 293, 297 (1954). Party-designated arbitrators are not expected to approach the dispute with the impartiality of a neutral arbitrator. See Note, *supra,* 68 *Harv.L.Rev.* at 296–97. Indeed, the partisanship of the party-designated arbitrator is perceived as an advantage of the tripartite system, ensuring that each party's position will be adequately presented and pressed before the panel. *Id.* at 297. A special relationship between the non-neutral arbitrator and the party that designated him is "implicit in the nature of the tripartite format here freely adopted by the parties" to the contract, and is an advantage of equal benefit to both parties. *Tipton v. Systron Donner Corp., supra,* 99 *Cal. App.*3d at 506, 160 *Cal.Rptr.* at 305.

The Court's error in this regard results both from a misguided sense of commercial morality and a mistaken notion of sound public policy. Its morality consists of the proposition that there is something inherently evil in allowing party-designated arbitrators to participate in the resolution of disputes when they may be partial to the party that selected them. The truth is that there is nothing wrong with it at all. The parties specifically intend and expect it and are sophisticated enough to know

the consequences of their choice of a tripartite panel. The neutral arbitrator is abundantly aware of the nature and composition of such a panel and is not misled in the least. It would indeed be evil if the arbitrator expected by the parties to be neutral were actually partial, but that is not at all what this case is about. Justification for the majority's position in respect of party-designated arbitrators would arise only if the appearances so grievously affected the public's confidence—they certainly do not affect the expectations or confidence of the parties—in the system of arbitration as to warrant foregoing the designed advantage of this workable device. The general public, however, is not in the least bit concerned about tripartite commercial arbitration. Those who know anything at all about the practice understand the need and desire for party-designated arbitrators who are indeed partisan.

If some dilution of public confidence in the integrity of arbitration results from this practice, it is insignificant compared to the loss of value that would result if the practice were deprecated in New Jersey, where it is well-entrenched and totally accepted in the commercial world. Moreover, were the practice to be deprecated substantially, a much more significant dilution of public confidence in this Court would result from its misguided decision than the insignificant diminishment of public confidence in the commercial arbitration procedure. Finally, because the Court's result condemns but does not effectively prohibit the very thing that is alleged to affect the public's confidence, namely the appearance of partiality, no benefit is achieved in terms of maintaining the integrity of commercial arbitration proceedings.

Although the Court says it understands that the party-designated arbitrator is not expected to be entirely neutral, it proceeds nevertheless to draw a line between "acceptable general predisposition of attitude" on the one hand and "impermissible bias or partisanship (or the appearance thereof)" on the other. *Ante* at 191. Invoking the language of the trial court below, it suggests that this line is crossed when the arbitrator maintains

undisclosed, substantial business relationships with the party that selected him. *Id.*

The drawing of any such "line" is an ill-advised and unnecessary labor. The arbitration statute does not forbid "the appearance of partisanship" as may be suggested by the mere status or relations of the arbitrators and parties. Rather, it forbids the arbitrator's "evident partiality." *N.J.S.A.* 2A:24–8(b). "Partisan [the party-appointed arbitrator] may be, but not dishonest." *Astoria, supra,* 11 *N.Y.2d* at 137, 227 *N.Y.S.2d* at 407, 182 *N.E.2d* at 89.

Even if it were necessary to draw such a line, which it is not, it should not be drawn in an artificial and meaningless way. The Court's approach creates a presumption that all arbitrators with undisclosed, substantial and ongoing business relationships with a party are impermissibly biased or partial, regardless of the absence from the record of any indication that the proceedings were in fact tainted by actual or demonstrable partiality. This presumption is both irrational and unworkable. It disqualifies an arbitrator of totally impartial character and disposition on the speculative ground that his business relationships suggest a relatively high risk of bias and impartiality. The Second Circuit in *Rosshavet, supra,* has recognized that

> [t]he most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results. * * * To vacate an arbitration award where nothing more than an appearance of bias is alleged would be "automatically to disqualify the best informed and most capable potential arbitrators." [638 *F.2d* at 552 (quoting *Commonwealth Coatings, supra,* 393 *U.S.* at 150, 89 *S.Ct.* at 340, 21 *L.Ed.2d* at 306 (White, J., concurring)).]

On the other hand, the majority's approach would not reach the arbitrator who has no substantial, ongoing business relationship with the party that designated him, but who may in fact feel a greater degree of "impermissible bias or partisanship" toward a party than any arbitrator who maintains the suspect relationship. Those arbitrators having no active or significant

business dealings may be infinitely more partial in favor of a party than those with such dealings. The social friend, the political ally, the long-term business associate, the expectant customer—all can be biased in favor of the party selecting them to a much greater degree than the expectant creditor of this case. It would be ironic, if it did not produce such a bad result, to note that the expectant creditor is the *last* person to be regarded as biased in *favor* of the party that selected him. All that a payment during the pendency of proceedings may do is neutralize the creditor's hostility. All of these other relationships, mentioned above, create partiality not only in fact but in appearance.

There is no magical quality to ongoing business relationships that triggers the fact of bias. Presumably the majority, as well as the trial court below, would hold that arbitrator Spatz would have been qualified to sit on the panel even though his prior business dealings had rendered him totally dependent on the party selecting him, and his future business life similarly dependent, just so long as there were no present, ongoing business dealings between them. The position is most untenable.

Moreover, that the parties can waive objection to selection of the other's designated arbitrator if his business relationships are fully disclosed bespeaks the artificiality of the disclosure requirement. If the existence of too substantial a business relationship between arbitrator and a party creates a presumption that the arbitrator cannot render an impartial decision and award, how is that bias or partiality transformed into impartiality by the other party's failure to object after being told the score? According to the majority's analysis, that which might cause an arbitrator to conduct himself with partiality is his having an interest in the proceedings because of a close relationship with the party that appointed him to the panel. If such an interest did in fact exist at the outset of the proceedings, it would not dissipate upon disclosure of the relationship.

This underlying inconsistency in the majority's position stems from its refusal to recognize the most simple fact of this case. Once party-designated arbitrators are permitted, the cleansing of partisanship is impossible. One need not be a learned jurist to grasp the impossibility of the task. A party to a dispute is actually selecting the judge. No other practice could assure a stronger partisanship. Once the practice is permitted, judicial efforts to cleanse it of that fundamental partisanship will inevitably result in confusion of the worst kind.

In addition to this confusion born of trying to distinguish degrees of partiality and disqualify for one degree but not the other, the greater confusion results when a court condemning partiality in this connection proclaims the virtuous result that it has achieved. The majority's whole game in this instance is directed at eliminating the appearance of bias; yet, when it comes to the end, it throws in the towel. The worst possible bias in fact is to be permitted, if waived, and the forbidden appearances are equally permitted. Hence one must wonder how the majority's solution serves its declared purpose of maintaining "the integrity of arbitration and public faith in the process." *Ante* at 189.

In seeking to fulfill that purpose at the expense of the contractual considerations that should control the result in this case, the majority dismisses well-settled decisional law that the submission of a dispute to arbitration is essentially a matter of contract between the parties. See *e. g., Kearny PBA, supra*, 81 *N.J.* at 217; *In re Arbitration Between Grover, supra*, 80 *N.J.* at 230–31 (1979); *Clifton Bd. of Educ. v. Clifton Teachers Ass'n*, 154 *N.J.Super.* 500, 503 (App.Div.1977); *Moreia Constr. Co., Inc. v. Wayne Tp.*, 98 *N.J.Super.* 570, 575–76 (App.Div.) certif. den., 51 *N.J.* 467 (1968); *Wm. J. Burns, Inc. v. N.J. Guards Union*, 64 *N.J.Super.* 301, 307 (App.Div.1960); *Mitchell v. Alfred Hofmann, Inc.*, 48 *N.J.Super.* 396, 405–06 (App.Div.1958); *Harsen v. Bd. of Educ. of West Milford Tp.*, 132 *N.J.Super.* 365, 370–71 (Law Div. 1975). The commercial arbitration process is a private one agreed upon by the contracting parties for the vindication of

their private contractual interests by application of arbitrators' specialized knowledge and expertise in the area in controversy. See, *e.g., Horne v. New England Patriots Football Club, Inc.,* 489 *F.Supp.* 465, 470 (D.Mass.1980); *Kearny PBA, supra,* 81 *N.J.* at 225 (Pashman, J., concurring). Through the medium of their agreement the parties have the right to decide what it is that will be arbitrated, who the arbitrators will be and how they will be selected, and how the arbitration will proceed. *Id.* at 225–27 (Pashman, J., concurring). The avowed goal of maintaining "public faith in the process" is at best secondary to the paramount public policy consideration of reviewing courts—the promotion and encouragement of voluntary arbitration as a means of resolving commercial disputes informally, expeditiously, relatively inexpensively, and in a manner that relieves our overburdened judicial resources. See *Carpenter v. Bloomer,* 54 *N.J.Super.* 157, 162 (App.Div.1959). See also *N.J. Mfrs. Ins. Co. v. Haran,* 128 *N.J.Super.* 265, 269 (App.Div.1974). The Court's decision ignores this primary public policy of encouraging arbitration and the informal resolution of commercial disputes, without furthering in any significant way "public faith in the process."

The only practical advantage in applying the disclosure requirement to party-designated arbitrators is that full disclosure of all business relationships between arbitrator and party would better enable the neutral arbitrator to evaluate the degree of bias or partisanship of the other two arbitrators in making his deliberations and decision. The avowed purpose of full disclosure is that it puts the neutral arbitrator on notice that the party-designated arbitrators might possibly be partisan. However, in tripartite commercial arbitration the neutral arbitrator is already aware at the outset of the proceedings that the party-designated arbitrators are designedly partisan. See Note, *supra,* 68 *Harv.L.Rev.* at 296. The neutral arbitrator automatically assumes that the party-designated arbitrators have been chosen to represent the respective sides by whom they were selected, and he knows that it is his responsibility to temper

their partisanship with his neutrality and objectivity. It is an accepted part of the process for which the parties have bargained.

## V

The Court's approach not only affects the restatement of prior decisional law and the reformulation of the arbitration statute, but also rewrites the contract between the parties. "Arbitration is essentially a creature of contract, a contract in which the parties themselves charter a private tribunal for the resolution of their disputes. The law does no more than lend its sanction to the agreement of the parties, the court's role being limited to the enforcement of the terms of the contract." *Astoria, supra,* 11 *N.Y.*2d at 132–33, 227 *N.Y.S.*2d at 404, 182 *N.E.*2d at 87. If the parties to the instant case wanted an all-neutral board of arbitrators, they would have so provided in their contract. But they did not. Their agreement expressly provides that each party shall designate a single arbitrator "to represent the party" and that the two party-designated arbitrators shall select the third or "neutral" arbitrator. They agreed to no words of limitation on the identity, status or relationships of the party-designated arbitrators, as they clearly could have if they so intended.

I would not deny the parties the right to have their dispute settled by the type of arbitration panel for which they have contracted. Nor would I require an affidavit from an arbitrator stating that despite his general predisposition of attitude, he went in to the arbitration objectively and free from actual partiality. To do so would be as unrealistic as the approach taken by the majority. The parties expect the designated arbitrators to continue their partisanship during the proceedings, and they expect them to present and advance the position of the party that selected them. Recognition of the inherent partisanship of party-designated arbitrators is the only intellectually honest approach to the situation. Their precise disposi-

tion at the time of the hearings, deliberation or decision cannot be the subject of judicial inquiry, for it would be an inquiry addressed to what should be an irrelevant issue. It would demonstrate only that the arbitrators were doing exactly what the parties intended, expected, and agreed that they should do, namely represent the interests of the party that designated them.

The method of selecting arbitrators established by the agreement of the parties must be complied with by the parties and followed by the courts. *Astoria, supra,* 11 *N.Y.2d* at 133, 227 *N.Y.S.2d* at 404, 182 *N.E.2d* at 404; M. Domke, *supra* at § 20.04. This Court may not rewrite their contract. See *LaStella v. Garcia Estates,* 66 *N.J.* 297, 304 (1975); *Astoria, supra,* 11 *N.Y.* 2d at 136, 227 *N.Y.S.2d* at 406, 182 *N.E.2d* at 89. The Court should enforce, not rescind, Barcon's unqualified contractual right to designate an arbitrator of its own choice, which right has been recognized as "the essence of tripartite arbitration." *Id.* at 135, 227 *N.Y.S.2d* at 405, 182 *N.E.2d* at 88. See Note, *supra,* 68 *Harv.L.Rev.* at 297. Contrary to the observation of the Appellate Division below, the New York Court of Appeals' decision in *Astoria* is not inconsistent with the subsequent decision of the same court in *J. P. Stevens & Co., Inc. v. Rytex Corp., supra.* The reason that *J. P. Stevens* was decided "without even mentioning" *Astoria,* see 172 *N.J.Super.* at 188, is because the two cases dealt with entirely different factual situations. The *J. P. Stevens* case concerned the alleged bias or partiality of a designedly neutral arbitrator. See 34 *N.Y.2d* at 129–30, 312 *N.E.2d* at 467, 356 *N.Y.S.2d* at 283. *Astoria,* which thoroughly discussed the applicable standards of impartiality of party-designated arbitrators, is still recognized as controlling law in New York. See, *e.g., In re Local 964, United Bhd. of Carpenters,* 73 *A.D.2d* 968, 424 *N.Y.S.2d* 253, 254 (App.Div.1980).

The court has rewritten the agreement between the parties in yet another fundamental respect. As a corollary of the arbitrator's responsibility to make full disclosure of all prior business relationships with a party to the arbitration, the majority grants

the other party the right to object to the designation of that arbitrator on the basis of the disclosed relationship. The fact of the matter is that in this species of tripartite commercial arbitration, where the agreement on the method of selection does not so provide, one party has no right to object to the other party's designation of a partisan arbitrator. M. Domke, *supra*, at § 20.03. As concluded in the *Astoria* case,

since both parties, by agreeing upon tripartite arbitration, have necessarily accepted the idea of "partisan" appointees, neither may object to the other's designation of someone associated with his interest or related to him. [11 *N.Y.* 2d at 138, 227 *N.Y.S.*2d at 408, 182 *N.E.*2d at 90.]

The completed arbitral award in this case should not be vacated for failure of Barcon's designated arbitrator to make full disclosure of his prior business relationships at the outset of the proceedings when the contract gave Tri-County no right to object to that selection in any event, even if full disclosure had been made.

## VI

The majority's pre-arbitration disclosure requirement now confers upon parties the pre-hearing right to object to the other party's selection of a representative arbitrator. However, it "leave[s] to the parties themselves" decisions as to the permissible degree of association between arbitrators and the parties. *Ante* at 194. In other words, the parties themselves are to determine what relationships are "substantial" enough to warrant the disqualification of an arbitrator initially selected by a party. That this procedure will lead to greatly increased pre-arbitration dispute is obvious. The majority opinion provides little or no useful guidance as to how the parties, once all relevant business relationships are disclosed, are to draw the line between relationships that evince an "acceptable general predisposition of attitude" and those that manifest "impermissible bias or partisanship or the appearance thereof." *Ante* at 191. Not only is it a distinction that cannot be drawn with any meaningful degree of certainty, but it is one that need not be discussed

with respect to a party-designated arbitrator in tripartite commercial arbitration.

Notwithstanding its assurances to the contrary, the Court has also made available an entirely new avenue for post-arbitral award challenge. The majority's decision will encourage parties dissatisfied with the award to delve deeply into each arbitrator's history in search of substantial business relationships with his appointor that the arbitrator may have failed to disclose at the outset of the proceedings. This approach encourages post-award litigation and invites uncertainty in the finality of a completed award, thereby eviscerating the arbitration process.

Before the Court so drastically changes the interpretation of "evident partiality" under *N.J.S.A.* 2A:24–8(b) for the avowed purpose of "maintaining the integrity of arbitration," there should be a showing that the present system of tripartite commercial arbitration is in need of such assistance from the judiciary—which is otherwise bound to allow the process to function unfettered by excessive intervention. It may be that judicial review is being exercised to police a situation in which the intended beneficiary of its intervention (tripartite commercial arbitration) is fairing quite well as is. The majority has added steps to the arbitration procedure that will adversely affect the expedience, economy and informality with which voluntary arbitration effects the private resolution of commercial disputes. See *Carpenter v. Bloomer, supra,* 54 *N.J.* at 162. A salutary device designed as "an end to litigation" now bids fair to become "the beginning of it," *In re Arbitration Between Grover, supra,* 80 *N.J.* at 235 (Pashman, Jr., dissenting)—"a springboard to litigation rather than remaining the end to it." *Kearny PBA, supra,* 81 *N.J.* at 227 (Pashman, J., concurring).

There is, of course, another possibility, and it is a real one—that the practical effect of today's decision will be nil. Since the parties are not at all interested in raising claims of bias or partiality against party-designated arbitrators, and since the Court's ruling allows them to waive such claims, in the future

they will merely waive them in advance. They will do so simply by means of a provision in their arbitration agreement that waives the disclosure otherwise required by the majority's approach. The majority is unwilling to proclaim disqualification as a matter of law, no matter what the degree of bias may be, preferring instead to allow waiver of same after disclosure. If the Court will allow the parties, with full knowledge of the consequences, to proceed with the arbitration process despite the most extreme manifestations of partiality, then logically it should allow them to do the same by waiving the disclosure requirement itself, with full knowledge of the fact that by so doing there may remain on the panel an arbitrator who is substantially biased in favor of the other party to the dispute.

Because the practice works, parties to tripartite commercial arbitration do not want or need a judicially-imposed requirement that the party-designated arbitrators disclose such prior dealings or relationships as would demonstrate the specific degree of their possible bias. The parties are not the least bit interested in that, for it is a given. The parties to the contract understand it, the party-designated arbitrators understand it, and the neutral arbitrator understands it. It is the unvarying expectation of everyone involved in the process.

Therefore, other than the unwarranted result in this particular case, the decision is likely to accomplish nothing. That is unfortunate in the sense that the Court identifies evil but does nothing to prohibit it. The only morally defensible conclusion to be derived from the premise that the appearance of partiality in party-designated arbitrators is evil is the prohibition of this form of tripartite commercial arbitration. There is no middle ground. I would disagree with such a result but would have to respect it. It would represent a balancing of the advantages of an efficient system of arbitration that is desired by the parties against the disadvantages of the appearance of partiality in any court-sanctioned resolution mechanism. Since I would disagree with a value judgment concluding that the possible disadvan-

tages of appearances outweigh the proven advantages of tripartite commercial arbitration, I would leave well enough alone.

Chief Justice WILENTZ and Justice SCHREIBER join in this opinion.

*For affirmance*—Justices SULLIVAN, PASHMAN, HANDLER and POLLOCK—4.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD and SCHREIBER—3.